IN THE UNITED STATES DISTRICT COURT
FOR THE MIDDLE DISTRICT OF FLORIDA
ORLANDO DIVISION

KATIE J. NIEBUHR, as
Personal Representative of the
Estate of JOHN JAY NIEBUHR,
deceased,

Plaintiff,

v. Case No.: 6:26-cv-01406

SHERIF BROWN, individually;
RAYNISHA WHEELER, individually;
MELBOURNE AIRPORT AUTHORITY;
CITY OF MELBOURNE;
CITY OF PALM BAY; and
FLOCK GROUP, INC.,

Defendants.
____________________________________/

**COMPLAINT AND DEMAND FOR JURY TRIAL**

Plaintiff, KATIE J. NIEBUHR, as Personal Representative of the Estate of JOHN JAY NIEBUHR, by and through undersigned counsel, hereby sues Defendants, SHERIF BROWN, individually; RAYNISHA WHEELER, individually; MELBOURNE AIRPORT AUTHORITY; CITY OF MELBOURNE; CITY OF PALM BAY; and FLOCK GROUP, INC., and demands a jury trial on the issues herein. In support thereof, Plaintiff states:

1. This is an action under federal and state law by KATIE J. NIEBUHR, as Personal Representative of the Estate of JOHN JAY NIEBUHR, arising from the fatal shooting of her brother, JOHN JAY NIEBUHR, by Melbourne Orlando International Airport Police Department (MAPD) Officer SHERIF

BROWN on June 28, 2024, at the Melbourne-Orlando International Airport, Melbourne, Brevard County, Florida.

2. Plaintiff brings the following claims, in sum:

**COUNT I: OBJECTIVELY UNREASONABLE DEADLY FORCE**, as to BROWN (Individual Capacity), in violation of Fourth and Fourteenth Amendments and pursuant to 42 U.S.C. § 1983.

**COUNT II: FAILURE TO INTERVENE**, as to WHEELER (Individual Capacity), in violation of Fourth and Fourteenth Amendments and pursuant to 42 U.S.C. § 1983.

**COUNT III: DELIBERATE INDIFFERENCE / MONELL LIABILITY — FAILURE TO TRAIN**, as to Melbourne Airport Authority and City of Melbourne, pursuant to 42 U.S.C. § 1983.

**COUNT IV: DELIBERATE INDIFFERENCE / MONELL LIABILITY — FAILURE TO SUPERVISE**, as to Melbourne Airport Authority and City of Melbourne, pursuant to 42 U.S.C. § 1983.

**COUNT V: WRONGFUL DEATH — NEGLIGENCE**, as to Melbourne Airport Authority, Fla. Stat. §§ 768.16–768.26.

**COUNT VI: WRONGFUL DEATH — NEGLIGENT TRAINING**, as to Melbourne Airport Authority and City of Melbourne, Fla. Stat. §§ 768.16–768.26.

**COUNT VII: WRONGFUL DEATH — NEGLIGENT HIRING, RETENTION, AND SUPERVISION**, as to Melbourne Airport Authority and City of Melbourne, Fla. Stat. § 768.28.

**COUNT VIII: WRONGFUL DEATH — BATTERY (WANTON AND WILLFUL)**, as to BROWN (Individual Capacity), Fla. Stat. §§ 784.03, 768.28(9). Pleaded in the alternative to Count IX.

**COUNT IX: WRONGFUL DEATH — BATTERY (BY AGENT IN SCOPE OF EMPLOYMENT)**, as to Melbourne Airport Authority and City of Melbourne, Fla. Stat. §§ 784.03, 768.28(1). Pleaded in the alternative to Count VIII.

**COUNT X: WRONGFUL DEATH — NEGLIGENCE (UNWARRANTED SITUATIONAL AWARENESS BULLETIN)**, as to City of Palm Bay, Fla. Stat. §§ 768.16–768.26, 768.28.

**COUNT XI: 42 U.S.C. § 1983 — JOINT ACTIVITY** BETWEEN GOVERNMENTAL ACTORS, as to City of Palm Bay, Fourth and Fourteenth Amendments.

**COUNT XII: 42 U.S.C. § 1983 — PRIVATE ACTOR LIABILITY (JOINT ACTIVITY / CONSPIRACY)**, as to Flock Group, Inc., Fourth and Fourteenth Amendments.

## JURISDICTION AND VENUE

3. Plaintiff's claims are predicated, in part, upon 42 U.S.C. § 1983, authorizing actions to redress deprivation, under color of state law, of rights, privileges, and immunities secured by the Constitution and laws of the United States, and upon 42 U.S.C. § 1988, which authorizes the award of attorneys' fees and costs to prevailing plaintiffs in actions under 42 U.S.C. § 1983.

4. Jurisdiction is founded upon 28 U.S.C. § 1331, as this is a civil action arising under the Constitution, laws, and/or treaties of the United States; and 28 U.S.C. § 1343, as this is a civil action seeking to redress deprivation, under color of any State law, statute, ordinance, regulation, custom and/or usage, of a right, privilege, or immunity secured by the Constitution of the United States.

5. Plaintiff further invokes the supplemental jurisdiction of this Court, pursuant to 28 U.S.C. § 1367, to consider the state law claims alleged herein.

6. Venue is proper in this district pursuant to 28 U.S.C. §§ 1391(b) and 1391(c), as the events sued upon occurred in this judicial district.

Pursuant to Local Rule 1.04, this action is properly assigned to the Orlando Division.

7. Plaintiff has complied, or will comply prior to entry of any judgment, with the pre-suit notice requirements of Fla. Stat. § 768.28(6), including written notice to each governmental entity and to the Florida Department of Financial Services.

**PARTIES**

8. Decedent JOHN JAY NIEBUHR was forty years old at the time of his death (date of birth May 4, 1984) and a resident of Brevard County, Florida.

9. Plaintiff KATIE J. NIEBUHR is the duly appointed Personal Representative of the Estate of JOHN JAY NIEBUHR, deceased, in Probate Brevard County Case No. 05-2026-CP-035220-XXCP-BC. Plaintiff brings this action on behalf of the Estate and on behalf of the statutory next of kin survivors of the decedent, including the decedent's father, John R. Niebuhr and mother, Sharon LaVallie.

10. At all times material hereto, Defendant SHERIF BROWN was a sworn probationary law-enforcement officer employed by the Melbourne Airport Authority and assigned to MAPD. BROWN is sued in his individual capacity.

11. At all times material hereto, Defendant RAYNISHA WHEELER was a sworn sergeant employed by the Melbourne Airport Authority and assigned to MAPD as the on-scene supervisor. WHEELER is sued in her individual capacity.

12. At all times material hereto, Defendant MELBOURNE AIRPORT AUTHORITY (the "Authority") is a public body and instrumentality of the City of Melbourne, established pursuant to § 12-138 of the Melbourne City Code. Pursuant to § 12-227 of the Melbourne City Code, the Authority holds direct supervision and control over MAPD and its officers, including BROWN and WHEELER. The Authority is a "person" subject to suit under 42 U.S.C. § 1983 and is a proper defendant under Fla. Stat. § 768.28.

13. At all times material hereto, Defendant CITY OF MELBOURNE is a Florida municipality. Pursuant to § 12-144 of the Melbourne City Code, MAPD officers "shall be deemed employees of the city to the same extent as all other employees of the city," making the City the ultimate municipal employer of BROWN and WHEELER. The City of Melbourne is a proper defendant under 42 U.S.C. § 1983 and Fla. Stat. § 768.28.

14. At all times material hereto, Defendant CITY OF PALM BAY is a Florida municipality and the governmental employer of the Palm Bay Police Department ("PBPD") and its officers. PBPD officers acted under color of state law, within the course and scope of their employment, and pursuant to the policies, customs, and practices of the City of Palm Bay. The City of Palm Bay is a proper defendant under Fla. Stat. § 768.28 and 42 U.S.C. § 1983.

15. Defendant FLOCK GROUP, INC. (“Flock”) is a private corporation organized under the laws of the State of Delaware, with its principal place of business in Atlanta, Georgia, and authorized to conduct business in the

State of Florida. Flock designs, manufactures, markets, and operates automated license plate reader (ALPR) surveillance systems, including the Flock Safety ALPR platform, under contract with governmental law-enforcement agencies, including PBPD. At all times material hereto, Flock operated its ALPR surveillance infrastructure pursuant to a contract with the City of Palm Bay/PBPD and provided law-enforcement officers with the technological capability and operational tools to conduct the warrantless, suspicionless automated tracking of NIEBUHR's vehicle that is alleged herein. Flock is a proper defendant under 42 U.S.C. § 1983 as a private actor that acted jointly with, conspired with, and/or was a willful participant in joint activity with governmental actors in the deprivation of NIEBUHR's constitutional rights.

16. At all times relevant hereto, all Defendants acted under the color of law or acted jointly with other Defendants acting under the color of law.

## FACTS

### A. The Decedent and His Lawful Status

17. At the time of his death on June 28, 2024, John Jay Niebuhr (NIEBUHR) was forty years old.

18. On June 28, 2024, NIEBUHR's Florida driver's license, vehicle registration, tags, plates, and insurance were all current and valid.

19. On June 28, 2024, NIEBUHR was lawfully in possession of a firearm in his vehicle pursuant to Florida Statute § 790.25(5).

20. On June 28, 2024, NIEBUHR's criminal history consisted of mostly minor drinking-related citations from when he was approximately 20 years old.

21. On June 28, 2024, NIEBUHR was not committing any crime.

**B. Palm Bay Police Department's Campaign of Surveillance and Targeting**

22. Before the shooting on June 28, 2024 - on or about June 4, 2024 - the Palm Bay Police Department (PBPD) issued a Situational Awareness Bulletin (the "Bulletin") identifying NIEBUHR as a subject of interest.

23. The Bulletin was circulated to area law enforcement agencies, including the Melbourne Police Department and MAPD.

24. The Bulletin identified NIEBUHR by name, described his vehicle, and included a picture of his truck taken from a FLOCK camera.

25. No criminal case was open against NIEBUHR at the time of the Bulletin's issuance.

26. No probable cause, reasonable articulable suspicion, judicial authorization, or other lawful predicate supported the Bulletin. The Bulletin was issued and disseminated without lawful justification.

27. Beginning June 19, 2024, PBPD Officer J. WELCH initiated FLOCK automated license plate reader (ALPR) surveillance on NIEBUHR's vehicle.

28. The FLOCK surveillance was logged under the stated reason of "Intel." No open criminal case, warrant, or other lawful basis supported it.

29. Flock Group, Inc. ("Flock") contracted with PBPD to provide, install, and operate its automated license plate reader (ALPR) surveillance platform within the City of Palm Bay's law-enforcement network. Under that

contract, Flock made its ALPR infrastructure — including its hot-list targeting capability, automated real-time vehicle-detection alerts, and cross-agency data-sharing architecture — available to PBPD for use in law-enforcement operations. Flock's platform is designed specifically for law-enforcement targeting purposes and is not a neutral public utility.

30. Flock's ALPR platform was the operative technological instrument through which PBPD Officer J. WELCH activated and sustained the warrantless, suspicionless surveillance of NIEBUHR's vehicle beginning June 19, 2024. Flock's system logged, processed, and made available to PBPD the location and movement data associated with NIEBUHR's vehicle tag (KPQQ61) under the stated reason of "Intel" — with no warrant, no open criminal case, and no lawful predicate. Flock willfully participated in and facilitated the surveillance targeting apparatus directed at NIEBUHR by providing the platform through which that warrantless surveillance was conducted.

31. On June 17, 2024, PBPD Officers Matthew BOGGESS, Jake DALTON, and Anthony SACCO confronted NIEBUHR on Kirkland Road while he was engaged in lawful activity on private property with the owner's permission.

32. The officers had body worn cameras (BWC). A screen shot of NIEBUHR from the BWC was used for the Bulletin.[1]

33. During the Kirkland encounter, Officer Boggess stated on camera that he called for backup solely because NIEBUHR's jewelry reminded him of

[1] The Bulletin pre-dates this encounter. It appears either the Bulletin was incorrectly dated, or created later and post-dated, or correctly dated and later updated with a screen shot from the June 17, 2024 encounter on Kirkland.

Brandon "Kapas" — a man shot and killed by a Palm Bay officer on January 28, 2024 — and not because of any criminal conduct. According to Boggess, NIEBUHR was supposedly "rocking all the gems and stuff" like "old boy Kapas."

34. Based on this encounter, PBPD officers internally characterized NIEBUHR as "sovereign-like" without any evidentiary basis or statements by NIEBUHR invoking sovereign citizen status.

35. Multiple Florida DAVID database records checks were run on NIEBUHR shortly before his death: June 18, 2024, by Brevard County Sheriff's Office; June 20, June 24, and June 25, 2024, by FDLE. The stated purpose by BCSO was "Verify Identity," and the stated purpose by FDLE was "Criminal Investigation."

36. No criminal charges were pending or filed against NIEBUHR. Each DAVID check would have confirmed only old, minor police contact. Even though PBPD had created the unwarranted Bulletin, there was no *valid* need to verify his identity or track NIEBUHR through FLOCK.

37. On June 24, 2024, NIEBUHR went to the Palm Bay Police Department lobby, met with the duty Sergeant, and complained – accurately – that law enforcement was watching and tracking him.

38. On the same day, NIEBUHR also went to the Palm Bay City Hall building to speak with officials.

39. Instead of addressing his concerns, PBPD dispatch notations labeled NIEBUHR "S20" (Signal 20 — mentally ill person) without any clinical basis, assessment, or referral for mental health evaluation.

40. On June 25, 2024, NIEBUHR telephoned PBPD again seeking a supervisor callback.

41. On June 26, 2024, PBPD linked NIEBUHR's formal complaint to the officer safety bulletin.

42. According to the Bulletin, PBPD characterized NIEBUHR's documented concern for his safety and privacy - which was factually accurate - as "paranoid" and "sovereign citizen behaviors."

43. On June 27, 2024, NIEBUHR also contacted the United States Department of Defense by telephone, presumably to report continued law enforcement harassment.

**C. The Airport Encounter on June 28, 2024**

44. On June 28, 2024, NIEBUHR was in his red Dodge Ram truck with his small dog, three cats, and dry cleaning.

45. His travels took him to the unsecured and publicly available areas of the Melbourne-Orlando International Airport in Brevard County, Florida where he sat and made random calls, including to his bank.

46. NIEBUHR was lawfully present in the area and no crime had been reported.

47. During this time, before any police contact, NIEBUHR called MAPD multiple times from his cell phone — at approximately 8:58 a.m., 9:01 a.m., and 9:11 a.m. per his cell phone records.

48. MAPD probationary Officer SHERIF BROWN would later admit during the FDLE investigation that he spoke with NIEBUHR on the MAPD duty phone for at least one of these calls and that NIEBUHR asked for directions to a location on/ near airport property.

49. BROWN would later claim after the shooting that his call with NIEBUHR caused him to think that NIEBUHR may be mentally ill.

50. After the shooting, other airport employees also would characterize NIEBUHR's appearance and conduct as indicating mental illness.

A. Airport-operations employee Seth Barber claimed he encountered NIEBUHR's truck blocking a single-lane exit gate (Gate 220) around 9:00 a.m. and later reported his behavior as "odd." Barber reported NIEBUHR's presence to MAPD.

B. Airport employee Travis McNeely noted NIEBUHR had very "conspicuous" rings on almost every finger, and "discerning" marks about the vehicle, notably a golden Eye of Osiris decal on the back window and an American flag/eagle wrap on the tailgate.

C. Airport Assistant Director of Operations Stephanie Betts would describe NIEBUHR's behavior as raising "red flags," though it is unclear whether this description is based on her own observations, or information from others.

D. Aircraft mechanic Christopher Friedle later said he was approached by NIEBUHR near a hangar and described him as "weird."

51. At approximately 9:22 a.m., BROWN arrived at NIEBUHRs location, got out of his vehicle, and contacted NIEBUHR who was seated in the driver's seat of his parked truck near 750 Harry Sutton Road.

52. BROWN positioned his marked patrol unit — with emergency lights activated — directly behind NIEBUHR's vehicle, blocking it in.

53. BROWN telephoned his supervisor, Sergeant WHEELER, to advise her of the stop.

54. NIEBUHR told BROWN he was waiting for someone.

55. Police would later characterize NIEBUHR’s conduct as consistent with a mental health crisis based on, in part:

A. When asked by BROWN what he needed, NIEBUHR said he didn’t need anything because everything was provided by up “above.”

B. At approximately 09:26:33[2], NIEBUHR attempted to back his truck up around BROWN’s vehicle but eventually re-parked after seeing the entrance blocked by an airport employee white van. NIEBUHR told BROWN to do what he needed to do and just "call your people."

C. At 09:32:18, NIEBUHR backed up a second time. The white van was still blocking the exit. NIEBUHR pulled back into the parking spot something to the effect of, “Or I can wait here, right?”

[2] Times are approximate and based on BWC and reports.

D. At 9:40:09, BROWN asked NIEBUHR if he was a private investigator. NIEBUHR purportedly said he was, refused to provide identification, and told BROWN to "Ask God" for his identification.

E. At 09:47:09, WHEELER arrived and BROWN told her NIEBUHR had purportedly said, "He (Brown) may need more people for what we're doing," and "Call more people to get me out of here."

F. At 09:49:00, WHEELER asked NIEBUHR how his day was going, he replied "great" or "strange."

G. When WHEELER asked NIEBUHR about his intentions, NIEBUHR purportedly said he needed to get on a plane and referenced nearby inoperable Atlas and Australian jets. When officers asked if he was a mechanic, NIEBUHR purportedly said he was.

56. But prior to WHEELER's arrival, at 09:40:49, BROWN had asked NIEBUHR "you got a permit – license to carry," and when NIEBUHR said "no" BROWN said, "you don't need it." BROWN then asked NIEBUHR, "are you carrying" and NIEBUHR told him he was. This seemed to satisfy BROWN because he told NIEBUHR that this wasn't "that type of call" and he wasn't going to handcuff him, even though he was detaining him to wait and talk to WHEELER.

57. BROWN would later claim that he became aware of the firearm when he approached the passenger side of the truck and saw it holstered on NIEBUHR's right hip.

58. Before her arrival, BROWN told WHEELER via radio that NIEBUHR had a firearm.

59. Despite his representation that NIEBUHR's firearm wasn't an issue, the video shows BROWN pulled his gun out to his side and turned off the safety at 09:42:13 - approximately ten minutes before the shooting.

60. WHEELER appears to have arrived approximately five minutes later because her BWC starts at 9:46:18.

61. The white airport employee van moved to the side of the road to allow WHEELER into the area, but WHEELER parked her vehicle so that it also blocked NIEBUHR's truck from leaving.

62. WHEELER initially approached the driver's side of the truck but then positioned herself at the passenger side, to BROWN's left.

63. WHEELER did not draw her firearm.

64. WHEELER and BROWN insisted NIEBUHR provide his name, even though the video shows BROWN had ran NIEBUHR's tag at the beginning of the stop and – before WHEELER arrived – and had told NIEBUHR he already knew his name because he had ran his tag.

65. At 09:51:51, BROWN opened the passenger door of NIEBUHR's truck, pushed aside the dry cleaning draped over the passenger seat, pointed his firearm directly at NIEBUHR, and said "I'm not playing."

66. BROWN initially told NIEBUHR to raise his hands and NIEBUHR did. BROWN then told NIEBUHR to *not* raise his hands.

67. WHEELER walked away from the truck towards the rear and radioed for an extra unit. She then reapproached the truck *without her gun drawn* before *walking away again.*

68. NIEBUHR attempted to give BROWN his driver's license.

69. At 09:52:48, NIEBUHR showed BROWN his pistol by raising it with one hand and pointing it upward – not toward BROWN.

70. BROWN then fatally shot NIEBUHR.

71. WHEELER heard the shots while she was at the back of the truck and - *without having eyes on the incident,* as confirmed by the video – radioed "shots fired" and "*subject aimed for his gun*!"

72. NIEBUHR did not fire his weapon.

**D. Death, Post-Incident, and Investigative Record**

73. NIEBUHR was transported to Holmes Regional Medical Center, where Dr. Mark Pessa pronounced him deceased at approximately 10:23 a.m.

74. An autopsy performed by Associate Medical Examiner Dr. Matrina Schmidt of the Brevard County Medical Examiner's Office on July 2, 2024, documented nine external gunshot-wound defects produced by four fired bullets with trajectories described as generally from the right-to-left side of NIEBUHR's body.

75. The Medical Examiner classified the manner of death as homicide caused by multiple gunshot wounds.

76. On information and belief, MAPD's chain of command reviewed and approved BROWN's training and deemed his use of force as compliant with

MAPD policy. That ratification constitutes additional evidence that the constitutional violation was the product of official policy and custom.

**COUNT I**
**OBJECTIVELY UNREASONABLE DEADLY FORCE**
**as to BROWN (Individual Capacity)**
**In Violation of Fourth and Fourteenth Amendments and**
**pursuant to 42 U.S.C. § 1983**

77. Plaintiff re-alleges paragraphs 1 through 74 as though fully set forth herein.

78. At all material times, BROWN acted under color of state law within the meaning of 42 U.S.C. § 1983.

79. NIEBUHR had a clearly established right to be free from objectively unreasonable deadly force. *Graham v. Connor*, 490 U.S. 386 (1989); *Tennessee v. Garner*, 471 U.S. 1 (1985).

80. NIEBUHR had a clearly established right under the Second Amendment and Florida Statute § 790.25(5) to possess a firearm in his vehicle. A citizen does not lose the right to be free from excessive force merely because he is lawfully armed.

81. Defendant intentionally used force against NIEBUHR:

a. BROWN opened the passenger door of NIEBUHR's vehicle, eliminating the only protective barrier between himself and NIEBUHR. ¶ 63.

b. BROWN drew his service pistol and pointed it at NIEBUHR at close range creating an unwarranted exigent circumstance. ¶ 63.

c. BROWN fired four rounds at NIEBUHR, who was seated in his vehicle. ¶ 58, 72. NIEBUHR did not fire. ¶ 70.

82. The force used by BROWN was objectively unreasonable because:

a. NIEBUHR had committed no crime. ¶¶ 19, 34.

b. NIEBUHR was seated in his vehicle throughout the encounter and had not made any threatening movement toward any officer during the first twenty-nine-plus minutes of contact. ¶¶ 49–66.

c. NIEBUHR was lawfully carrying his firearm under Florida Statute § 790.25(5). That lawful act cannot serve as justification for deadly force. ¶ 17.

d. BROWN drew his weapon approximately ten minutes before the shooting.

e. BROWN created the close-range confrontation by affirmatively opening the passenger door, eliminating the protective barrier and the reactionary gap. ¶ 63.

f. Under the AOJ framework, while NIEBUHR had the ability to use deadly force, the opportunity/ jeopardy was created by BROWN's own tactical decisions. ¶ 63.

g. While NIEBUHR raised his firearm with one hand, pointing it upward and not toward any officer. In moments prior, BROWN had just given contradictory commands, and NIEBUHR had attempted to hand BROWN his driver's license. ¶¶ 64, 66, 67.

h. A reasonable officer would not have opened the passenger door on an armed subject who had not pointed his weapon at anyone, and would instead have maintained distance, repositioned, removed the vehicle keys, and summoned crisis-intervention resources.

i. BROWN failed to employ de-escalation, containment, and crisis-intervention practices that a reasonable officer would have used.

83. BROWN's conduct was undertaken knowingly, willfully, maliciously, and with reckless or callous indifference to NIEBUHR's federally protected rights, entitling Plaintiff to punitive damages.

84. As a direct and proximate cause of the Defendant's breach of duty, NIEBUHR suffered death.

85. Plaintiff is entitled to all relief available under 42 U.S.C. § 1983, including compensatory damages, punitive damages to the extent permitted by law, and attorneys' fees and costs pursuant to 42 U.S.C. § 1988, as Plaintiff has been obligated to retain legal counsel.

**COUNT II**
**FAILURE TO INTERVENE**
**as to WHEELER (Individual Capacity)**
**In Violation of Fourth and Fourteenth Amendments and**
**pursuant to 42 U.S.C. § 1983**

86. Plaintiff re-alleges paragraphs 1 through 74 as though fully set forth herein.

87. At all material times, WHEELER acted under color of state law and was the supervising sergeant present at the scene.

88. WHEELER owed NIEBUHR a duty to intervene to stop a fellow officer's unlawful use of force when she had the opportunity and ability to do so.

89. WHEELER arrived before BROWN opened the passenger door.

90. During that window, WHEELER had the authority and realistic opportunity to direct BROWN to maintain distance and cover, to slow the encounter, and to refrain from opening the door.

91. Instead, WHEELER walked away from the truck toward the rear and radioed for an extra unit, then reapproached the truck without her firearm drawn, and then walked away from the truck again — leaving BROWN without active supervisory oversight at the moment he opened the door. ¶ 65.

92. WHEELER had a realistic opportunity to intervene and failed to do so, including by failing to:

a. Direct BROWN to maintain cover and distance.

b. Exercise her supervisory authority to direct or countermand BROWN's decision to open the passenger door.

c. Deploy crisis-intervention resources or a CIT-trained officer, despite BROWN's earlier communications that NIEBUHR was armed and saying things that did not make sense.

93. WHEELER's conduct was undertaken with reckless or callous indifference to NIEBUHR's federally protected rights, entitling Plaintiff to punitive damages.

94. As a direct and proximate result of WHEELER's failure to intervene, NIEBUHR suffered death.

95. Plaintiff is entitled to all relief available under 42 U.S.C. § 1983, including compensatory damages, punitive damages to the extent permitted by law, and attorneys' fees and costs pursuant to 42 U.S.C. § 1988, as Plaintiff has been obligated to retain legal counsel.

**COUNT III**
**DELIBERATE INDIFFERENCE / MONELL LIABILITY**
**FAILURE TO TRAIN**
**As to Melbourne Airport Authority and City of Melbourne**
**pursuant to 42 U.S.C. § 1983**

96. Plaintiff re-alleges paragraphs 1 through 74 as though fully set forth herein.

97. Municipal liability for failure to train under 42 U.S.C. § 1983 exists where: (1) the municipality inadequately trained its employees; (2) that failure constitutes a deliberate policy; and (3) that policy caused employees to violate a citizen's constitutional rights. *City of Canton v. Harris*, 489 U.S. 378, 387–91 (1989); *Monell v. Dep't of Soc. Servs.*, 436 U.S. 658 (1978).

98. The Authority and the City, as MAPD's policymakers, know to a certainty that their officers will be required to confront potentially armed subjects. *Canton,* 489 U.S. at 390 n.10. The need to train officers in the constitutional limits on the use of deadly force is so obvious that failure to do so constitutes deliberate indifference.

99. The Authority and the City each failed to adequately train BROWN and other MAPD officers in the constitutional limits on deadly force; de-

escalation and tactical patience; the AOJ (Ability, Opportunity, and Jeopardy) framework; maintenance of the reactionary gap; and heightened supervision requirements for probationary officers in high-risk encounters.

100. These deficiencies are programmatic failures in MAPD's training curriculum as a whole — not merely the shortcomings of BROWN individually.

101. Each training deficiency bore a direct causal relationship to NIEBUHR's death:

a. Failure to train in the AOJ framework leading to BROWN’s failure to apply AOJ to distinguish between ability (being armed) and opportunity/ jeopardy – which BROWN himself created by opening the door.

b. Failure to train in de-escalation caused BROWN to abandon a successful thirty-minute containment posture and close distance.

c. Failure to train in reactionary gap doctrine caused BROWN to open the passenger door compressing the decision window to approximately fifty-seven seconds.

d. Failure to require a field training officer to supervise a probationary officer in a high-risk encounter caused BROWN to manage the confrontation without any qualified oversight.

102. On information and belief, prior use-of-force incidents and citizen complaints within MAPD put the Authority and the City on actual or

constructive notice of training deficiencies, constituting an independent basis for deliberate indifference.

103. As a direct and proximate result of the Authority's and the City's deliberate indifference in failing to train, NIEBUHR was deprived of his Fourth and Fourteenth Amendment rights and suffered death.

104. Plaintiff is entitled to all relief available under 42 U.S.C. § 1983, including compensatory damages, punitive damages to the extent permitted by law, and attorneys' fees and costs pursuant to 42 U.S.C. § 1988, as Plaintiff has been obligated to retain legal counsel.

**COUNT IV**
**DELIBERATE INDIFFERENCE / MONELL LIABILITY**
**FAILURE TO SUPERVISE**
**As to Melbourne Airport Authority and City of Melbourne**
**pursuant to 42 U.S.C. § 1983**

105. Plaintiff re-alleges paragraphs 1 through 74 as though fully set forth herein.

106. The Authority and the City each failed to adequately supervise BROWN:

a. By permitting a probationary officer who had not completed his field training to conduct solo initial contact with an armed individual without a qualified field training officer present.

b. By failing to ensure WHEELER exercised active supervisory command over BROWN's tactical decision-making.

c. By failing to deploy crisis-intervention resources despite actual notice that NIEBUHR was armed and exhibiting unusual behavior.

d. By failing to review, audit, or correct BROWN's training deficiencies during his probationary period.

107. The Authority's and the City's failure to supervise was the moving force behind NIEBUHR's death.

108. As a direct and proximate result of the Authority's and the City's deliberate indifference in failing to supervise, NIEBUHR was deprived of his Fourth and Fourteenth Amendment rights and suffered death.

109. Plaintiff is entitled to all relief available under 42 U.S.C. § 1983, including compensatory damages, punitive damages to the extent permitted by law, and attorneys' fees and costs pursuant to 42 U.S.C. § 1988, as Plaintiff has been obligated to retain legal counsel.

**COUNT V**
**WRONGFUL DEATH — NEGLIGENCE**
**As to Melbourne Airport Authority**
**Fla. Stat. §§ 768.16–768.26**

110. Plaintiff re-alleges paragraphs 1 through 74 as though fully set forth herein.

111. This count is brought under Florida's Wrongful Death Act, Fla. Stat. §§ 768.16–768.26. The Authority's sovereign immunity is waived pursuant to Fla. Stat. § 768.28 for negligent acts of its officers within the scope of their employment.

112. BROWN and WHEELER were employees of the Authority acting within the scope of their employment. The Authority, through its officers, owed NIEBUHR a duty to use reasonable care in the operational handling of the encounter.

113. The Authority, through its officers, breached that duty by: failing to use time, distance, cover, and containment; failing to summon crisis-intervention resources; and opening the passenger door of an armed subject's vehicle, thereby creating the close-range confrontation that caused NIEBUHR's death.

114. As a direct and proximate result of the Authority's negligence, NIEBUHR suffered fatal gunshot wounds and died.

115. The Estate and statutory survivors sustained the damages recoverable under the Wrongful Death Act, including loss of support and services, loss of companionship and protection, mental pain and suffering, medical and funeral expenses, and lost net accumulations, as set forth in Fla. Stat. § 768.21, and, if allowed, punitive damages.

**COUNT VI**
**WRONGFUL DEATH — NEGLIGENT TRAINING**
**As to Melbourne Airport Authority and City of Melbourne**
**Fla. Stat. §§ 768.16–768.26**

116. Plaintiff re-alleges paragraphs 1 through 74 as though fully set forth herein.

117. This count asserts a claim of negligent training under Florida's Wrongful Death Act. Sovereign immunity is waived pursuant to Fla. Stat. § 768.28.

118. The Authority and the City undertook to train their law-enforcement officers and owed a duty to exercise reasonable care to provide BROWN and WHEELER with adequate training to perform their duties safely.

119. The Authority and the City breached that duty by negligently failing to provide adequate training in the constitutional limits on deadly force, de-escalation, the AOJ framework, and crisis-intervention principles.

120. That negligent training was a direct and proximate cause of the close-range deadly confrontation and of NIEBUHR's death.

121. The Estate and statutory survivors sustained the damages recoverable under the Wrongful Death Act, including loss of support and services, loss of companionship and protection, mental pain and suffering, medical and funeral expenses, and lost net accumulations, as set forth in Fla. Stat. § 768.21, and, if allowed, punitive damages.

**COUNT VII**
**WRONGFUL DEATH — NEGLIGENT HIRING, RETENTION, AND SUPERVISION**
**As to Melbourne Airport Authority and City of Melbourne**
**Fla. Stat. § 768.28**

122. Plaintiff re-alleges paragraphs 1 through 74 as though fully set forth herein.

123. This count asserts claims of negligent hiring, retention, and supervision under Florida's Wrongful Death Act. Sovereign immunity is waived pursuant to Fla. Stat. § 768.28.

124. The Authority and the City each owed NIEBUHR a duty to exercise reasonable care in the hiring, retention, and supervision of BROWN.

125. The Authority and the City breached their duties by: (a) failing to ensure BROWN had received adequate training; (b) retaining BROWN as a probationary officer without ensuring requisite field training safeguards;

(c) failing to provide a field training officer to supervise BROWN during the high-risk encounter; and (d) failing to take reasonable supervisory measures to redirect the encounter toward containment.

126. The Authority's and the City's negligence in the hiring, retention, and supervision of BROWN was a direct and proximate cause of NIEBUHR's death.

127. The Estate and statutory survivors sustained the damages recoverable under the Wrongful Death Act, including loss of support and services, loss of companionship and protection, mental pain and suffering, medical and funeral expenses, and lost net accumulations, as set forth in Fla. Stat. § 768.21, and, if allowed, punitive damages.

**COUNT VIII**
**WRONGFUL DEATH — BATTERY**
**(WANTON AND WILLFUL DISREGARD FOR HUMAN RIGHTS OR SAFETY)**
**As to Defendant SHERIF BROWN (Individual Capacity)**
**Fla. Stat. §§ 784.03 and 768.28(9)**
**Pleaded in the Alternative to Count IX pursuant to Rule 8(d)(2)**

128. Plaintiff re-alleges paragraphs 1 through 74 as though fully set forth herein.

129. This count is brought under Florida's Wrongful Death Act and is asserted against BROWN individually.

130. On June 28, 2024, BROWN intentionally fired four rounds at NIEBUHR, causing physical injury and death against NIEBUHR's will.

131. BROWN acted in bad faith, with malicious purpose, and/or with wanton and willful disregard of human rights and safety because, at the time of the shooting, BROWN had actual knowledge that: (a) NIEBUHR had

committed no crime; (b) NIEBUHR had not pointed his firearm at any officer before BROWN opened the door and gave confusing commands; (c) NIEBUHR was lawfully carrying his firearm under Florida Statute § 790.25(5); and (d) BROWN affirmatively created the close-range confrontation by opening the door.

132. BROWN has forfeited any immunity pursuant to Fla. Stat. § 768.28(9)(a) and is personally liable for the battery.

133. As a direct and proximate result of BROWN's battery, NIEBUHR suffered grievous bodily injury and death.

134. The Estate and statutory survivors sustained the damages recoverable under the Wrongful Death Act, including loss of support and services, loss of companionship and protection, mental pain and suffering, medical and funeral expenses, and lost net accumulations, as set forth in Fla. Stat. § 768.21, and, if allowed, punitive damages.

**COUNT IX**
**WRONGFUL DEATH — BATTERY**
**(BY AGENT IN SCOPE OF EMPLOYMENT)**
**As to Melbourne Airport Authority and City of Melbourne**
**Fla. Stat. §§ 784.03 and 768.28(1)**
**Pleaded in the Alternative to Count VIII pursuant to Rule 8(d)(2)**

135. Plaintiff re-alleges paragraphs 1 through 74 as though fully set forth herein.

136. On June 28, 2024, BROWN committed battery on NIEBUHR by intentionally firing four rounds, causing physical injury and death.

137. To the extent BROWN's conduct is found not to rise to the level of bad faith sufficient to strip immunity under Fla. Stat. § 768.28(9)(a), the Authority

and the City are liable for the battery as BROWN's employer under Fla. Stat. § 768.28(1).

138. Pursuant to §§ 12-144 and 12-227 of the Melbourne City Code, BROWN was an employee of the City and subject to the supervision and control of the Authority. The battery was committed within the course and scope of his employment. Sovereign immunity has been waived as set forth in Fla. Stat. § 768.28(1).

139. As a direct and proximate result of BROWN's conduct, NIEBUHR suffered grievous bodily injury and death.

140. The Estate and statutory survivors sustained the damages recoverable under the Wrongful Death Act, including loss of support and services, loss of companionship and protection, mental pain and suffering, medical and funeral expenses, and lost net accumulations, as set forth in Fla. Stat. § 768.21, and, if allowed, punitive damages.

**COUNT X**
**WRONGFUL DEATH — NEGLIGENCE**
**(Issuance of Unwarranted Situational Awareness Bulletin as Proximate Cause of Death)**
**As to City of Palm Bay**
**Fla. Stat. §§ 768.16–768.26; 768.28**

141. Plaintiff re-alleges paragraphs 1 through 74 as though fully set forth herein.

142. This count is brought under Florida's Wrongful Death Act. The City of Palm Bay's sovereign immunity is waived pursuant to Fla. Stat. § 768.28 for the negligent acts and omissions of its officers committed within the scope of their employment.

143. This Count is grounded exclusively in PBPD's operational acts — the specific decisions involved in issuing the Bulletin, activating FLOCK ALPR surveillance, making contact with NIEBUHR, and mischaracterizing his complaints — not in any challenge to discretionary policy decisions.

144. The City of Palm Bay, through its PBPD officers, owed NIEBUHR a duty of reasonable care, including a duty not to issue, circulate, or maintain an investigative bulletin targeting a private citizen in the absence of any lawful predicate.

145. PBPD breached that duty by:

a. Issuing the June 4, 2024 Situational Awareness Bulletin without probable cause, reasonable articulable suspicion, or any open criminal case. ¶¶ 20–24.

b. Conducting warrantless FLOCK ALPR surveillance without any lawful predicate. ¶¶ 25–28.

c. Subjecting NIEBUHR to repeated pretextual law enforcement contacts. ¶¶ 29–33.

d. Dismissively handling NIEBUHR's formal complaint, labeling him "S20" without clinical basis, and converting his complaint into an officer safety bulletin. ¶¶ 35–40.

e. Failing to provide mental health resources, conduct a welfare check, or alert MAPD that NIEBUHR was a vulnerable individual requiring a crisis-response posture.

146. The issuance of the Bulletin and the surveillance campaign were a proximate cause of NIEBUHR's death. The Bulletin foreseeably caused MAPD officers to approach NIEBUHR as a pre-identified threat, affecting their tactical decision-making which caused or contributed to the shooting.

147. As a direct and proximate result of the City of Palm Bay's negligence, NIEBUHR suffered fatal gunshot wounds and died.

148. The Estate and statutory survivors sustained the damages recoverable under the Wrongful Death Act, including loss of support and services, loss of companionship and protection, mental pain and suffering, medical and funeral expenses, and lost net accumulations, as set forth in Fla. Stat. § 768.21, and, if allowed, punitive damages.

## COUNT XI
## JOINT ACTIVITY BETWEEN GOVERNMENTAL ACTORS
## As to City of Palm Bay
## Pursuant to Fourth and Fourteenth Amendments and 42 U.S.C. § 1983

149. Plaintiff re-alleges paragraphs 1 through 74 as though fully set forth herein.

150. Both PBPD officers and MAPD officers acted under color of state law. NIEBUHR had clearly established Fourth and Fourteenth Amendment rights to be free from unreasonable seizure, unlawful profiling, and the use of excessive and unreasonable deadly force.

151. A governmental actor is liable under § 1983 as a willful participant in joint activity when it shares a common unlawful goal with another state actor and agrees on a joint course of action in furtherance of that goal.

152. PBPD went far beyond merely reporting NIEBUHR to MAPD (and other law enforcement agencies). PBPD:

a. Issued the Bulletin formally flagging NIEBUHR as a threat subject to MAPD without any criminal predicate. ¶¶ 20–24.

b. Conducted ongoing FLOCK ALPR surveillance, embedding NIEBUHR within the shared law enforcement targeting apparatus. ¶¶ 25–28.

c. Converted NIEBUHR's formal complaint into an officer safety bulletin, intentionally exaggerating and mischaracterizing his documented and accurate safety concerns as "paranoia" — supplying MAPD with factual pretexts that predictably caused responding officers to treat NIEBUHR as dangerous.

d. Labeled NIEBUHR "S20" without clinical basis and took no steps to provide mental health resources or alert MAPD that NIEBUHR was vulnerable. ¶ 37.

153. MAPD officers arrived at the scene with NIEBUHR already framed as a threat subject by PBPD's Bulletin and acted on that predicate.

154. PBPD and MAPD shared a common unlawful goal — the surveillance, profiling, containment, and targeting of NIEBUHR without criminal predicate — and agreed on a joint course of action. That joint activity was the proximate cause of NIEBUHR's death.

155. NIEBUHR was deprived of his constitutional rights through the joint activity of PBPD and MAPD, including: (a) his right to be free from

warrantless FLOCK ALPR surveillance; (b) his right to be free from baseless governmental profiling; (c) his Second Amendment and Florida Statute § 790.25(5) right to possess a firearm without that lawful act being used as a threat marker; and (d) his right to be free from the use of excessive and unreasonable deadly force.

156. The issuance of the Bulletin, the FLOCK authorization, and the conversion of NIEBUHR's complaint into an officer safety bulletin each reflect official PBPD policy or custom for which the City of Palm Bay is responsible under *Monell v. Dep't of Soc. Servs.*, 436 U.S. 658 (1978).

157. As a direct and proximate result of the City of Palm Bay's joint activity with MAPD, NIEBUHR was deprived of his constitutional rights and suffered fatal gunshot wounds.

158. Plaintiff is entitled to all relief available under 42 U.S.C. § 1983, including compensatory damages, punitive damages to the extent permitted by law, and attorneys' fees and costs pursuant to 42 U.S.C. § 1988, as Plaintiff has been obligated to retain legal counsel. Defendant's conduct was undertaken with reckless or callous indifference to NIEBUHR's federally protected rights, entitling Plaintiff to punitive damages. The City of Palm Bay, the Melbourne Airport Authority, and the City of Melbourne are jointly and severally liable for the § 1983 damages flowing from their joint activity. Flock Group, Inc.'s joint and several liability for § 1983 damages arising from its participation in the surveillance apparatus is addressed in Count XII.

**COUNT XII**
**PRIVATE ACTOR LIABILITY**
**As to Flock Group, Inc.**
**(Joint Activity / Conspiracy with Governmental Actors)**
**Pursuant to Fourth and Fourteenth Amendments and 42 U.S.C. § 1983**

159. Plaintiff re-alleges paragraphs 1 through 74 as though fully set forth herein.

160. A private actor may be held liable under 42 U.S.C. § 1983 when it acts jointly with, conspires with, or is a willful participant in joint activity with a state actor to deprive a person of a constitutional right. *See Dennis v. Sparks*, 449 U.S. 24, 27–28 (1980); *Lugar v. Edmondson Oil Co.*, 457 U.S. 922, 941 (1982); *Brentwood Academy v. Tennessee Secondary Sch. Athletic Ass'n*, 531 U.S. 288, 295 (2001). Private defendants are subject to § 1983 liability on a joint activity or conspiracy theory regardless of whether the state official with whom they acted is entitled to immunity. *Dennis*, 449 U.S. at 27–28.

161. No formal agreement or "smoking gun" is required. A private actor is liable under § 1983 when the evidence establishes (1) an understanding between the private actor and a state actor to commit acts that would deprive a person of a federal right, and (2) willful participation in the joint activity. *Bendiburg v. Dempsey*, 909 F.2d 463, 469 (11th Cir. 1990). Proof may be established through circumstantial evidence, including the nature of the contractual relationship between the private actor and the state, the operational role the private actor played in the challenged conduct, and whether the private actor's system or product was specifically deployed

against the plaintiff. *Grider v. City of Auburn*, 618 F.3d 1240, 1260 (11th Cir. 2010).

162. Flock Group, Inc. ("Flock") is a private surveillance corporation that contracts with law-enforcement agencies to provide automated license plate reader (ALPR) systems, including the Flock Safety platform, through which participating agencies can monitor, track, flag, and share vehicle location data in near real-time. Flock's platform permits law enforcement agencies to enter vehicle tags as "hot list" subjects and to receive automated alerts whenever a vehicle so entered is captured by any Flock-networked camera within a participating network. Flock's systems are designed to facilitate and extend law-enforcement surveillance operations, but are ripe for obvious abuse and clearly lack safeguards to avoid abuse.

163. Pursuant to a contract with the City of Palm Bay and/or PBPD, Flock installed, operated, and maintained its ALPR infrastructure within the City of Palm Bay's law-enforcement surveillance network. Under that contractual arrangement, Flock made its ALPR platform, its data-sharing infrastructure, and its operational support available to PBPD for use in law-enforcement operations, including the surveillance operations directed at NIEBUHR.

164. Beginning on or about June 19, 2024, PBPD Officer J. WELCH activated Flock ALPR surveillance targeting NIEBUHR's vehicle — Florida tag KPQQ61 — logging the surveillance under the stated reason of "Intel." No warrant, no open criminal case, no probable cause, and no reasonable

articulable suspicion supported that activation. The surveillance was suspicionless and warrantless.

165. Flock's ALPR platform, as deployed under Flock's contract with PBPD, provided the operational infrastructure through which PBPD conducted the warrantless, suspicionless automated tracking of NIEBUHR's vehicle. Flock's system was the instrument by which PBPD embedded NIEBUHR within a shared law-enforcement surveillance and targeting apparatus, enabling PBPD to monitor and track NIEBUHR's location and movements without independent legal predicate.

166. Flock was not a passive provider of neutral technology. Flock designed its ALPR platform to integrate with law-enforcement investigative systems, to facilitate the entry of vehicle tags for targeted monitoring, and to generate automated alerts to law-enforcement officers when flagged vehicles are detected. Flock markets and operates its platform specifically for law-enforcement targeting purposes, including "hot list" surveillance of specific vehicles. In contracting with PBPD and operating its platform for PBPD's benefit, Flock willfully participated in and facilitated the surveillance apparatus directed against NIEBUHR.

167. Flock acted jointly with, conspired with, and/or was a willful participant in joint activity with PBPD — a governmental actor operating under color of state law — in conducting and sustaining the warrantless, suspicionless ALPR surveillance of NIEBUHR's vehicle. The close nexus between Flock and PBPD's surveillance operations, the contractual integration of Flock's

platform into PBPD's law-enforcement apparatus, and the specific use of Flock's system to target NIEBUHR establish that Flock's conduct in facilitating that surveillance is fairly attributed to the State.

168. The warrantless, suspicionless ALPR surveillance of NIEBUHR's vehicle, conducted through Flock's platform, violated NIEBUHR's clearly established rights under the Fourth Amendment to be free from unreasonable searches and seizures, including the right to be free from warrantless, prolonged governmental tracking of one's vehicle's location and movements.

169. The ALPR surveillance Flock facilitated was a proximate and contributing cause of NIEBUHR's death. Flock's platform was the operative tool that sustained the targeting apparatus established by the Bulletin. The chain of causation from Flock's surveillance to NIEBUHR's death is direct: The Bulletin led to Flock-platform enabled targeting; the Flock surveillance helped shape the ultimate Bulletin because a Flock photo of NIEBUHR's truck was included; the Flock surveillance and the Bulletin shaped MAPD's posture; and that posture contributed to the fatal encounter on June 28, 2024.

170. As a direct and proximate result of Flock's joint activity and/or conspiracy with PBPD, NIEBUHR was deprived of his rights secured by the Fourth and Fourteenth Amendments to the United States Constitution and suffered fatal gunshot wounds.

171. Plaintiff is entitled to all relief available under 42 U.S.C. § 1983, including compensatory damages, punitive damages to the extent permitted by law, and attorneys' fees and costs pursuant to 42 U.S.C. § 1988, as Plaintiff has been obligated to retain legal counsel. Defendant's conduct was undertaken with reckless or callous indifference to NIEBUHR's federally protected rights, entitling Plaintiff to punitive damages. The City of Palm Bay, the Melbourne Airport Authority, the City of Melbourne and Flock are jointly and severally liable for the § 1983 damages flowing from their joint activity.

**JURY TRIAL DEMAND AND REQUESTED RELIEF**

WHEREFORE, Plaintiff respectfully requests:

A. A trial by jury on all claims and issues in this matter that may be tried to a jury;

B. Upon judgment or verdict, Compensatory Damages in an amount to be determined against all Defendants, jointly and severally as permitted by law, including violations of civil rights, conscious physical pain and suffering before death, medical and funeral expenses, loss of prospective net estate, mental pain and suffering of survivors, and loss of companionship, support, and guidance;

C. Award punitive damages as allowed by law;

D. Reasonable Attorneys' Fees and Costs pursuant to 42 U.S.C. § 1988 and other applicable law;

E. Pre-judgment and post-judgment interest as allowed by law;

F. A claims bill for damages in excess of the applicable statutory cap, pursuant to Fla. Stat. § 768.28(5); and

G. Such other and further relief, whether in law or in equity, as this Court deems just and proper.

Respectfully submitted,

By: ______________________________

**JESSICA J. TRAVIS, FBN 76701**
Attorney for Plaintiff

**DefendBrevard.com**
1329 Bedford Drive, Suite 2
Melbourne, FL 32940
Ph: 321 – 728 – 7280
Fx: 321 – 728 – 8020
Direct email:
Jessica@DefendBrevard.com
Eservice:
eservice@DefendBrevard.com
eservice2@DefendBrevard.com